Argued and submitted February 7, affirmed September 8, 2005

David H. PATTERSON
and Michelle Patterson,
husband and wife,
*Respondents,*

*v.*

Steven A. AMUNDSON,
an individual,
*Appellant,*

*and*

UNITED STATES OF AMERICA,
acting by and through its Internal Revenue Service,
*Defendant.*

CCV 0206127; A122866

119 P3d 264

Michael M. Ratoza argued the cause for appellant. With him on the briefs were Adam R. Kelly and Garvey Schubert Barer.

Peggy Hennessy argued the cause for respondents. With her on the brief was Reeves, Kahn & Hennessy.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Armstrong, Judge.

ARMSTRONG, J.

---

* Brewer, C. J., *vice* Leeson, J. pro tempore.

## ARMSTRONG, J.

Defendant appeals from a judgment in a quiet title action that awarded plaintiffs specific performance of a contract to sell a house. On appeal, defendant argues that the trial court erred in granting specific performance because (1) plaintiffs breached the contract; (2) plaintiffs revoked and rescinded the contract; or (3) plaintiffs' claim is barred by laches. We affirm.

In November 1994, defendant[1] and plaintiffs signed a "Sale Agreement and Receipt for Earnest Money." The document provided that plaintiffs agreed to purchase defendant's house for $275,000

"on the following terms: Earnest Money (on option) herein receipted for $4,000

"at or before closing, the balance of option payment $84,500

"at closing and upon delivery of [the deed] the sum of * * * $186,500 payable as follows: Purchaser to pay approximately $88,500 non-refundable lease option payment as stated above. $84,500 (approx.) balance of lease option payment is due on Feb. 6, 1995 or 5 days prior to sellers' new home purchase closing not earlier than Feb. 11, 1995 but no later than April 15, 1995. From lease option payment date, * * * buyer to pay rent in the amt. of existing Fed VA PITI [principal, interest, taxes, and insurance] payment to seller until option exercised & closing date (on or before Dec 31). Buyer at closing date to assume existing VA loan or secure new financing to pay off VA loan with no additional proceeds to seller. Buyers' attorney to review and approve lease option payment within 5 bus. days of sales agreement."

The agreement also provided that plaintiffs were purchasing the house "as is," that they had the right to have the house professionally inspected, and that they could rescind the sale agreement based on the results of that inspection. The agreement further provided that

---

[1] Defendant and defendant's former wife executed the relevant documents in 1994 and 1995. Defendant and his wife dissolved their marriage in 1996 and defendant received title to the house in the dissolution.

"TIME IS OF THE ESSENCE. Closing documents shall be executed and Buyer's funds deposited in escrow and closing shall occur on or before Dec 31, 1995, or as soon thereafter as financing documents can be prepared and marketable title delivered, but not to exceed ten (10) additional business days. This transaction is 'closed' when the deed or contract is recorded and funds are disbursed to Seller."

Plaintiffs paid defendant $4,000 in earnest money in November 1994.

Plaintiffs signed another agreement with defendant on April 14, 1995. That document, entitled "Lease with Purchase," provided that plaintiffs would lease defendant's house from May 15, 1995, through December 31, 1995, for a monthly rent of $1,662. Under the lease, plaintiffs were generally responsible for maintaining the house, but defendant was responsible for "[m]ajor maintenance and repair * * * not due to [plaintiffs'] misuse."

The lease-with-purchase agreement also provided that

"[s]hould Lessee remain in possession of the demised premises with the consent of Lessor after the natural expiration of this lease, a new month-to-month tenancy shall be created between Lessor and Lessee which shall be subject to all the terms and conditions hereof but shall be terminated on ____ days' written notice served by either Lessor or Lessee on the other party.

"* * * * *

"Purchase Option. It is agreed that [plaintiffs] shall have the option to purchase [defendant's house] for the purchase price of two hundred seventy-five thousand and no/100 dollars ($275,000.00) with a down payment of eighty-eight thousand five hundred dollars ($88,500.00) payable upon the exercise of said purchase option * * *."

The agreement further stated that "[n]o other recorded or unrecorded liens or encumbrances can occur by [defendant] from this date forward." Also on April 14, plaintiffs gave the escrow company a check for $85,469.26. The parties sent escrow instructions that indicated that the check consisted of the $84,500 balance of down payment, the first partial

month's rent, and escrow and recording fees. The instructions indicated that the parties understood that the sale was estimated to close on December 31, 1995. The instructions also authorized the escrow agent to release the $84,500 balance of the down payment to defendant.

Plaintiffs moved into the house in May 1995. Although they had personally inspected the house, plaintiffs did not have the home professionally inspected before they moved in. At that time, defendant had not provided plaintiffs with the disclosure form required by ORS 105.475.[2]

During their 1995 tenancy, plaintiffs told defendant of a number of problems that required significant repair, including a leak in the roof, problems with Louisiana-Pacific siding, inadequate drainage that affected the foundation, and leaky plumbing. Plaintiffs sent defendant a September 1995 letter that asked that the problems be fixed. The letter stated that plaintiffs understood that the lease-with-purchase agreement required defendant to make the necessary repairs. Plaintiffs wanted to make sure that the repairs

---

[2] ORS 105.475 provides:

"(1) If a seller issues a seller's property disclosure statement and a buyer has not then delivered to the seller a written statement waiving the buyer's right to revoke the buyer's offer, the buyer shall have five business days after delivery of the seller's property disclosure statement to revoke the buyer's offer by delivering to the seller a separate signed written statement of revocation disapproving the seller's disclosure.

"(2) If a buyer fails to timely deliver to a seller a written statement revoking the buyer's offer, the buyer's right to revoke the buyer's offer expires.

"(3) If a buyer closes the transaction, the buyer's right to revoke based on ORS 105.462 to 105.490, 696.301 and 696.870 is terminated.

"(4) If the seller fails or refuses to provide a seller's property disclosure statement as required under this section, the buyer shall have a right of revocation until the right is terminated pursuant to subsection (3) of this section.

"(5) If the buyer revokes the offer pursuant to this section, notwithstanding ORS 696.581, the buyer is entitled to immediate return of all deposits and other considerations delivered to any party or escrow agent with respect to the buyer's offer, and the buyer's offer is void.

"(6) When the deposits and other considerations have been returned to the buyer, upon the buyer's signed, written release and indemnification of the holders of the deposits and other considerations, the holders are released from all liability for the deposits and other considerations.

"(7) Any seller's property disclosure statement issued by the seller is part of and incorporated into the offer and the acceptance."

were made before they closed on their purchase of the house. Defendant refused to make the requested repairs.

On December 18, 1995, plaintiffs' attorney sent a letter to defendant that stated, in part, that plaintiffs were entitled to revoke and rescind their offer to purchase defendant's house because defendant had not provided a copy of the disclosure form that ORS 105.475 required. The letter said that plaintiffs were "elect[ing] to revoke and rescind their offer to purchase" the house and that, pursuant to ORS 105.475(5), defendant was obligated to immediately return the $88,500 that plaintiffs had paid in earnest money and as a down payment.

The letter also said:

"[Plaintiffs] are now, and have been for some time, tenants of yours in this house. They have previously informed you that portions of the plumbing appear to leak, portions of the roof leak and have damaged interior ceilings, and the siding is defective in several places. * * * Please repair these items promptly.

"Without waiving or restricting [plaintiffs'] revocation of their offer, and without waiving any of their rights under the Oregon Residential Landlord and Tenant Act, [plaintiffs] are willing to consider purchasing the house from you, as-is and with all defects, for $163,000. This reflects a reduction in the base price to $225,000, which [plaintiffs] believe[ ] approximated the fair market value of the house if it were in good condition, and allowance for the cost to repair the leaking roof, the defective siding, the defective plumbing, and the undermined portion of the foundation. This offer remains open until December 22, 1995 and is made for purposes of settlement only."

Plaintiffs' attorney enclosed with the letter a separate written statement that said:

"I, David Patterson, [plaintiff,] hereby rescind my agreement to purchase from you the property at 12500 SE Bluff Drive, Clackamas, Oregon because you have not delivered to me either the disclosure or the disclaimer forms required by ORS 105.465 to 105.490.

"I give you this notice pursuant to ORS 105.475."

Defendant did not immediately respond to plaintiffs' letter and did not make any repairs to the house. Consequently, plaintiffs did not make arrangements to close their purchase of the house on December 31, 1995. Although they did not get a response from defendant, plaintiffs did not vacate the house and continued to pay the rent. In January 1996, defendant attempted to remedy some of the problems identified by plaintiffs. His efforts did not satisfy plaintiffs. Plaintiffs subsequently sought damages from defendant in a mediation, but no settlement was reached.

In December 1997, the Internal Revenue Service (IRS) attached a lien of over $68,000 to the house because defendant had failed to pay federal income taxes. In February 1998, defendant filed for bankruptcy, and plaintiffs' claim for damages against defendant was discharged in the bankruptcy. After the bankruptcy proceeding, defendant left the state. Plaintiffs continued to make rental payments to the escrow company after he left. In April 1999, defendant's counsel sent plaintiffs a letter that stated:

> "Please be aware that the lease agreement entered into by you with [defendant], dated April 14, 1995, has terminated. You are presently in possession of the real property located at 12500 S.E. Bluff Drive, Clackamas, OR as tenants at sufferance, or under a month-to-month tenancy.
>
> "As you may be aware, [defendant] owns the deed to the stated real property. * * * Accordingly, demand is made upon each of you * * * to remove yourselves and your possessions from the stated real property, and to vacate the stated real property, on or before May 31, 1999. Your tenancy shall terminate as of May 31, 1999. Upon your failure to completely remove yourselves and your possessions from the stated real property by the end of the day on May 31, 1999, then [defendant] shall pursue all legal means available to him to remove you and your possessions from the real property."

Plaintiffs did nothing in response to the letter, and defendant took no further action at the time.

In June 2002, plaintiffs filed this action against defendant and the IRS seeking a judgment that quieted title in the property to them. At trial, defendant contended that

plaintiffs' action was barred by laches and the relevant statute of limitation; that plaintiffs had not complied with the "time is of the essence" provision in the contract of sale and were therefore not entitled to specific performance; that the parties had no contract that could be specifically performed because plaintiffs had revoked and rescinded the sales agreement; and that plaintiffs were not entitled to specific performance because they had not been ready, willing, and able to pay off the underlying mortgage throughout the course of the dispute.

In December 2002, defendant instructed his loan servicing agent to refuse plaintiffs' monthly payments unless plaintiffs paid an increased monthly rent of $2,200. Plaintiffs continued to make monthly payments of $1,662 per month, but the agent refused the payments. From that point on, plaintiffs placed their monthly payment in a separate account. Defendant did not make any payments on his mortgage after he instructed the servicing agent to refuse plaintiffs' payments, and defendant's mortgage company initiated a foreclosure proceeding against the property in July 2003.[3] Before trial, the IRS agreed to remove its lien on the property and was dismissed as a party.

After trial, the trial court issued a memorandum of decision in which it found that

"the agreement between plaintiffs and defendant * * * is evidenced by two documents: * * * the Earnest Money Agreement, and * * * a document entitled 'Lease With Purchase.' * * *

"* * * [I]t was the intent of the sellers to list their property and sell the property to the purchasers. * * * What the buyers wanted was to take advantage of a tax break regarding other property that they had purchased and sold, by purchasing this property after a certain date. Seller simply intended to sell the property, and did not seek to create a landlord-tenant relationship. He did not seek to do anything but accommodate the buyer in his desire to buy the property. * * * [I]t is clear from the evidence that the intent was that the seller would get all of his equity out and be due

_____

[3] The issues presented by the foreclosure proceeding have no bearing on this case.

no additional sums, that (after the time had expired in which the buyer was seeking to extend) the buyer would either pay or assume the underlying mortgage, and the deal would be closed. * * *

"[I]n accordance with the parties' intent, the buyers moved into the property and began making the underlying mortgage payments. Between that date and the close of 1995, which was to be when the closing was to be held, a bona fide dispute arose between the [parties] over conditions on the property."

The court concluded that plaintiffs were entitled to specific performance of the parties' agreement and entered a judgment to that effect. On appeal, defendant argues that the trial court erred in ordering specific performance of the contract because (1) plaintiffs refused to close at the time specified in the agreement and were therefore in breach of the contract, (2) they revoked and rescinded the contract of sale, and (3) their claim was barred by laches.

Before turning to those assignments, we first emphasize that defendant and plaintiffs agree that their contract was designed to accomplish one primary purpose: legal sale of the property in a way that reduced the buyers' federal taxes by allowing them to close no sooner than December 1995 but requiring them to pay defendant the amount of his equity in the property in April 1995.

Defendant argues that the trial court should not have ordered specific performance because plaintiffs breached the contract by refusing to close the sale, their breach was not excused by the condition of the property, and specific performance was inequitable under the circumstances. Plaintiffs respond that they always complied with the material terms of the contract and were not obligated to close on December 31, 1995, either because the parties' contract did not contain a "time is of the essence" clause that applied to closing or, alternatively, because defendant waived any such clause that did apply. Plaintiffs also contend that specific performance is particularly appropriate because defendant received the benefits that he was to receive from their performance of the contract and he was not harmed by

the delay in closing the sale. Plaintiffs rely particularly on the trial court's statement that

> "[i]t would be extremely inequitable for this court to order a forfeiture of the nearly $90,000 paid on this agreement at the time that the Lease with Purchase document was signed, and award ownership to the seller, who admitted that[,] after he received that money under the agreement,"

he was not owed any money.

■ Defendant challenges both the trial court's interpretation of the contract and its grant of specific performance. Defendant argues that plaintiffs did not exercise the option to purchase the home according to the option terms. He relies on *Usinger v. Campbell*, 280 Or 751, 572 P2d 1018 (1977), for the proposition that plaintiffs cannot obtain specific performance of the contract because they failed to perform their contractual obligations. In *Usinger*, the Supreme Court affirmed the trial court's refusal to grant the plaintiff specific performance where the plaintiff did not tender performance by the required time, the parties' contract stated that time was of the essence, and the defendant had not waived that provision. *Id.* at 758. Defendant argues that, under *Usinger*, in order to be entitled to specific performance, plaintiffs were required to tender full payment by December 31, 1995. Because they did not do that, he contends that they breached the contract and cannot now obtain specific performance. We consider the contract and the parties' conduct to determine whether plaintiffs were required to tender performance on or before December 31, 1995.

■■ In the absence of ambiguity, we construe the words of a contract as a matter of law. *Eagle Industries, Inc. v. Thompson*, 321 Or 398, 405, 900 P2d 475 (1995). The lease-with-purchase agreement unambiguously provides that plaintiffs had to pay defendant $88,500 in order to exercise the option to purchase. It is undisputed that plaintiffs paid defendant that amount. Defendant contends, however, that the "time is of the essence" provision in the agreement gave plaintiffs the option to purchase the house only until

December 31, 1995. We need not determine whether defendant's characterization of the effect of that provision is correct because defendant waived any time-of-the-essence requirement for closing.

> " 'Waiver involves both knowledge and intention; an estoppel may arise when there is no intention to mislead. Waiver depends upon what one himself intends to do; estoppel depends upon what he caused his adversary to do[.]' In other words, waiver is a voluntary act or declaration, whereby the waiver surrenders some privilege or right."

*Mitchell v. Hughes*, 80 Or 574, 580-81, 157 P 965 (1916) (citation omitted).

> "The rule with regard to waiver of a time is of the essence clause in a land sales contract is that: '* * * [A]ll the terms of the contract are binding upon all the parties thereto and that if the vendor, for whose benefit the stipulation about time being of the essence of the contract is made, would insist upon it, he must act promptly upon that provision so that any indulgence upon his part will amount to a nullification of that feature of the covenant. In effect, by operation of law upon his indulgence, a new contract is brought into existence for the time being, from which that clause is absent, and it so remains in this modified form until by reasonable notice to the opposite party that it will thereafter be insisted upon, the agreement between the parties is restored to its original form.' "

*Walker v. Feiring*, 53 Or App 433, 437, 632 P2d 1270 (1981) (quoting *Johnson et al v. Berns et al*, 111 Or 165, 173, 224 P 624 (1924)).

Defendant's actions are inconsistent with an intent to enforce any time-of-the-essence provision. Between December 1995 and the time of trial, defendant took no action to close the sale. Indeed, defendant *never* demanded timely closing. Rather, defendant engaged in negotiations with plaintiffs about the condition of the property until at least mid-1996. Furthermore, for nearly seven years, from January 1996 through mid-2002, defendant accepted plaintiffs' monthly payments. By those actions, defendant waived any right to require closing on or about December 31, 1995; he never reinstated that requirement. *See Alderman v. Davidson*, 326 Or 508, 513-14, 954 P2d 779 (1998) (repeated

acceptance of late payments demonstrates an intention to waive right to require prompt payment; the right to prompt payment, although waived, can be reinstated with notice of an intent to insist on strict compliance with the terms of the parties' contract). Hence, plaintiffs did not breach the agreement by failing to close on December 31, 1995. Having determined that plaintiffs were not in breach of the agreement for failing to close the sale, we need not consider defendant's argument that the condition of the property did not justify plaintiffs' alleged breach.

■ We turn to defendant's argument that it was inequitable for the trial court to award specific performance. Plaintiffs paid defendant the contractual down payment in 1994 and 1995, which constituted all of defendant's equity in the property. Although plaintiffs did not also assume or pay off defendant's mortgage in December 1995, their monthly payment effectively eliminated the burden that the mortgage imposed on defendant. After plaintiffs' claim for damages was discharged in defendant's bankruptcy, the IRS lien, rather than plaintiffs' unwillingness to close, prevented plaintiffs from closing the sale. Plaintiffs were ready, in December 1995, to close the sale once their contract dispute with defendant was resolved. After defendant's bankruptcy and attachment of the IRS lien, plaintiffs were prepared to close as soon as defendant took care of the tax lien as required by the parties' contract.

Defendant's protests to the contrary are unpersuasive, and we do not think it equitable for defendant to receive plaintiffs' payment of $88,500, the benefit of their payments for principal, interest, taxes, and insurance on the property, the value of the repairs that plaintiffs made to the property, and the value of the appreciation of the property over what is now a ten-year period, all of which would occur if we denied specific performance of the contract. Plaintiffs were at all times willing to close the contract if the dispute over the condition of the property were resolved and if defendant could provide them with clear title. We agree with the trial court that it is equitable to award plaintiffs specific performance. *Clarno v. Grayson*, 30 Or 111, 127, 46 P 426 (1896) ("[H]e who would insist upon strict performance must himself not be the cause of the breach. His own wrong can never

operate under the sanction of law to his advantage, nor to the injury of another."); *Edmunds v. Edmunds*, 186 Or App 585, 590-91, 64 P3d 1189 (2003).

■ Defendant also contends that the court erred in ordering specific performance because plaintiffs revoked and rescinded the contract in December 1995. Plaintiffs respond that they did not revoke or rescind the contract in December 1995 because defendant never acted on their purported revocation or rescission. For purposes of the issues presented by this case, we treat revocation under ORS 105.475 and rescission as equivalent.

■ When one party properly rescinds a contract, the contract is void and "the parties should be restored, as nearly as possible, to their situations prior to the transaction." *Bodenhamer v. Patterson*, 278 Or 367, 376, 563 P2d 1212 (1977). An attempted rescission is ineffective unless the other party to the contract is given notice of the rescission. *Stovall v. Publishers Paper Co.*, 284 Or 53, 57, 584 P2d 1375 (1978). "[A] notice of the rescission or termination of a contract, to be effective as such, must be clear and unambiguous, conveying an unquestionable purpose to insist on the rescission. * * * [A] notice of re[s]cission must be not only unequivocal but unconditional." *Id.* (internal quotation marks omitted). Even if a notice of rescission is sufficient, "[w]here the conduct of one having the right to rescind a contract is ambiguous, and it is not clear whether he has rescinded it or not, he will be deemed not to have done so." *Id.* at 62 (internal quotation marks omitted).

Even assuming that plaintiffs' December 1995 letter constituted an unequivocal and unconditional notice of rescission, we conclude that plaintiffs' overall conduct was ambiguous and that they therefore did not rescind the contract. Although the letter stated plaintiffs' intention to rescind the contract, they did not vacate the house, they continued to make payments under the contract, and they continued to negotiate with defendant over repairs. That conduct indicates an intention to enforce the contract rather than to rescind it. We therefore reject defendant's contention

that the court erred in awarding plaintiffs specific perform-ance of the contract because plaintiffs had rescinded it in December 1995.

Defendant's final assignment of error is that the court erred in concluding that plaintiffs' action was not barred by laches.

"In order to prevail on [a] defense of laches, [a] defendant [generally] must * * * establish the following three ele-ments: (1) [the] plaintiffs delayed asserting their claim for an unreasonable length of time, (2) with full knowledge of all relevant facts (and laches does not start to run until such knowledge is shown to exist), (3) resulting in such substan-tial prejudice to [the] defendant that it would be inequitable for the court to grant relief."

*Mattson v. Commercial Credit Business Loans*, 301 Or 407, 419, 723 P2d 996 (1986). "If the action is commenced after the expiration of the analogous statute of limitations, the plain-tiff must prove the absence of laches." *Fontana v. Steenson*, 145 Or App 229, 232, 929 P2d 336 (1996). Defendant con-tends that, because plaintiffs brought this action after the analogous statute of limitation expired, plaintiffs bore the burden of proving the absence of laches, and they did not meet that burden. Plaintiffs respond both that the analogous statute of limitation had not expired and that, even if it had, they met their burden by demonstrating that defendant was not substantially prejudiced by their delay in filing the action. We agree with plaintiffs' latter argument.

At trial, plaintiffs presented evidence that rebutted any presumption that defendant was substantially preju-diced by their failure to bring this action earlier. Plaintiffs demonstrated that defendant received all the equity that he had in the house in 1995. From then on, plaintiffs made monthly payments that covered the mortgage obligation, property taxes, and insurance. Thus, the mortgage was only nominally an obligation of defendant. The delay did not prej-udice defendant, and plaintiffs' claim was not barred by laches.

Affirmed.