Argued and submitted May 22, 2008, at Lakeview High School, Lakeview, limited judgment reversed and remanded for entry of judgment for defendants on district's claim of specific performance; supplemental judgment for attorney fees reversed June 10, respondent's petition for reconsideration filed June 24 and appellant's opposition to respondent's petition for reconsideration filed June 30 allowed by opinion August 12, 2009

See 230 Or App 330, 215 P3d 111 (2009)

## PHOENIX-TALENT SCHOOL DISTRICT #4,
a political subdivision of the State of Oregon,
*Plaintiff-Respondent,*

*v.*

## Charlie HAMILTON
and Michael Thirkill,
*Defendants-Appellants.*

Jackson County Circuit Court
052105E2; A134433

210 P3d 908

Joseph E. Kellerman argued the cause for appellants. With him on the briefs were Eric B. Mitton and Hornecker, Cowling, Hassen & Heysell, L.L.P.

Timothy C. Gerking argued the cause for respondent. With him on the brief were Thaddeus G. Pauck and Brophy Mills Schmor Gerking Brophy & Paradis, LLP.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Defendants Hamilton and Thirkill appeal from a limited judgment for plaintiff Phoenix-Talent School District #4 (district) on the district's claim for specific performance of an agreement to purchase real property from defendants and from a supplemental judgment awarding attorney fees to the district. Defendants assign error to the trial court's denial of their motion for summary judgment and to the granting of the district's cross-motion for summary judgment. For the reasons explained herein, we reverse the judgments for the district and remand for entry of judgment for defendants.

The summary judgment record reveals the following uncontested facts. In 2004, the district negotiated with defendants for the purchase of approximately 17 acres of land in Jackson County for future development as a school site. On October 26, 2004, the parties signed a sale agreement and earnest money receipt for the district's purchase of the property. A recital in the earnest money agreement described the property as "Tax Lots 2806 and 2805, consisting of approximately 16.98 acres of land which, prior to closing, shall be combined into one parcel to be known as Tax Lot 2806 pursuant to a lot line adjustment further described in this Agreement."

The agreement, drafted by the district's legal counsel, provided for a purchase price of $1,528,200, including earnest money of $50,000. Section 4 of the agreement set a closing date of February 22, 2005. Section 6 of the agreement was captioned "Conditions" and stated that the district's obligation to purchase the property "is contingent on satisfaction of each of the following conditions on or before Closing": the district's approval of a physical inspection of the property; Jackson County's approval of a lot line adjustment with respect to Tax Lots 2806 and 2805; and defendants' preparation and recording of easements for ingress and egress. Section 6.2 of the agreement, the condition for approval of the lot line adjustment, specifically provided:

> "6.2  The approval of a lot line adjustment with respect to Tax Lots 2806 and 2805, whereby [describing the lot line adjustment]. Upon Buyer's approval of the inspections described in Section 6.1 of this Agreement, the parties shall

hire Mike La[N]ier to prepare a lot line application and submit the same to Jackson County for approval. Friar & Associates shall also be hired by the parties to perform the survey work required in connection with the lot line adjustment. Any and all costs incurred in connection with the lot line adjustment shall be split equally by the parties."

Section 7 of the agreement also made mention of the lot line adjustment, describing defendants' obligation to deliver to the district on closing "a statutory warranty deed to Tax Lot 2806, including all land included within that parcel as a result of the lot line adjustment described in Section 6.2."

Section 13 of the agreement provided that "TIME IS OF THE ESSENCE OF THIS AGREEMENT." (Capitalization in original.) That section further provided:

"If the contingencies described in Section 6 of this Agreement *are satisfied or waived by Buyer* and the transaction does not thereafter close, through no fault of Sellers', before the close of business on the Closing Date, Buyer shall forfeit the earnest money deposit to Sellers as liquidated damages, and this Agreement shall be of no further effect, it being the intention of the parties that Buyer may forfeit the earnest money and be free of any further obligations under this Agreement. If the contingencies described in Section 6 of this Agreement are satisfied or waived by Buyer and Sellers fail to deliver the deed described in Section 7 of this Agreement on the Closing Date or otherwise fail to consummate this transaction, the earnest money shall be refunded to Buyer, and Seller shall also reimburse Buyer for the costs of any inspections actually performed on the Property, and Buyer shall have the right to pursue any other remedy to Buyer at law or equity, including the specific performance of this Agreement."

(Emphasis added.)

The parties hired LaNier to work on the lot line adjustment. A lot line adjustment involves changing the dimension of a common boundary between two lots through an administrative approval by a city or county. The adjustments to the dimensions of Tax Lots 2805 and 2806 required altering the boundaries of three different lots. Recognizing that the lot lines would not be adjusted by February 22, 2005, the parties agreed to extend the closing date to April 22,

2005, and executed a written addendum to that effect. The county discovered that two of the lots subject to the lot line adjustment had not been legally created, causing further delay. Defendant Hamilton met with the Jackson County Planning Department and learned that the lot line adjustment could not be completed by the closing date of April 22, 2005. On April 18, defendants notified the district by letter that the contract would expire on April 22, 2005, and further advised, "[W]e will not able to extend the contract beyond this date." Defendants stated in the letter that, after April 22, 2005, they would release the district's earnest money.

On April 21, 2005, the county notified defendant Hamilton that it could not make the requested lot line adjustment and proposed two alternatives, each of which would require further discussion, documentation, and processing. On that same date, the district's legal counsel wrote to defendants, requesting a postponement of the closing date or, in the alternative, expressing an intention to waive the "the requirement to complete [the lot line adjustment] prior to closing":

> "The District hereby demands that you honor your contractual obligations and proceed to close the sale of the real property that is the subject of the Agreement. * * * [I]n the likely event that you will require additional time in order for the County to approve the lot line adjustments, the District would be willing to postpone closing for a sufficient period of time to allow that to occur, assuming reasonable diligence is employed on your part. If you refuse, the District will waive the requirement to complete this condition prior to closing, extend the time for completion of the lot line adjustment and require you to close the sale on the Closing Date. The District is ready, willing and able to proceed with closing on April 22, 2005."

Defendants declined to extend the closing date. On May 10, 2005, the district again expressed a desire to extend the closing date and a willingness "to waive the need to accomplish the lot line adjustment or other action needed to separate the parcels before the closing date." Defendants declined to negotiate further.

■■ The district brought this claim for specific performance, and on cross-motions for summary judgment, the trial

court granted the district's motion. The court determined that the "time-essence" provision of the agreement was for the benefit of both parties, but reasoned that it could be waived by either party with respect to the timing of the other party's performance. *See Alk v. Lanini*, 61 Or App 158, 161, 656 P2d 367 (1982), *rev den*, 294 Or 613 (1983) (a time-essence clause that is for the benefit of both parties to the agreement may be waived by one party only with regard to the timing of the other party's performance). The court treated the lot line adjustment as a part of defendants' obligations under the agreement and held that the district had waived the time-essence provision with respect to the timing of the performance of that obligation. The court said that, "[u]nless and until it is shown that the lot line adjustment is impossible to perform, defendants are not relieved from their promise to perform it." The limited judgment required defendants to complete the lot line adjustments and then convey the property to the district.

At the heart of this appeal is whether, as the trial court determined, the completion of the lot line adjustment was a component of defendants' performance and obligation to close the transaction on the assigned date, the timeliness of which could be waived by the district, or whether, as defendants contend, the lot line adjustment was a condition precedent to the obligation to close so that, absent either waiver or satisfaction, its failure to occur rendered the agreement unenforceable after the closing date. The district maintains that when, as here, the satisfaction of the alleged condition is within the control of one of the contracting parties, it must be viewed as a promise of that party. The district reasons that it could, and did, waive the timeliness of defendants' performance of that promise so as to postpone the closing of the transaction.

Defendants counter that the lot line adjustment was not within their control once it had been submitted to the county and, more importantly, that the provisions relating to the lot line adjustment do not constitute a promise by defendants for which the district may waive timely performance. Rather, they assert that the lot line adjustment was a joint undertaking of the parties, that the accomplishment of that

undertaking was a condition precedent to the closing of the sale, and that both parties did not agree to postpone the closing date. Accordingly, defendants contend, when, through no fault of either party, the lot line adjustment could not be completed by April 22, 2005, the agreement terminated by its own terms.

Neither party asserts that the contract is ambiguous with respect to whether the lot line adjustment must be treated as a condition precedent or as a component of defendants' obligation for which the district could waive the time-essence provision. The parties also agree that there is no issue of material fact and that either the district or defendants are entitled to judgment as a matter of law. ORCP 47 C. We therefore decide the legal issue of whether the agreement obligates defendants to convey the property under these circumstances.

As noted earlier, the contingency itself is approval by the county of the lot line adjustment. The condition requires that approval and the joint application for that adjustment by the parties. The application was made; the adjustment was not approved. The issue is whether the contingency stated an explicit or implicit promise by defendants to do more or whether the contingency merely described an occurrence (county approval of the lot line adjustment) that was a necessary predicate to closing.

■ The parties agree that Section 6.2 of the earnest money contract states a contingency or condition precedent to the obligation to consummate the property sale. A condition precedent is one that must occur before liability arises on the promise that the condition qualifies. *Oregon Southwest, LLC v. Kvaternik*, 214 Or App 404, 164 P3d 1226 (2007), *rev den*, 344 Or 390 (2008); *Vision Realty, Inc. v. Kohler*, 214 Or App 220, 226, 164 P3d 330 (2007) (quoting *Falkenstein v. Pishioneri*, 80 Or App 203, 206, 720 P2d 1341 (1986)).

A condition precedent can be the occurrence of a fact or event, *i.e.*, an objective condition, or a promise to obtain some result, *i.e.*, a subjective promise, or both a promise and a condition. Although promises and conditions are different, the distinction can be blurred, and the determination

whether a provision states a promise, a condition, or both, can be difficult.[1] As pertinent here, if the obtaining of the lot line adjustment was a promise—a component of defendants' obligation to deliver marketable title at the time of closing—then the timeliness of that performance under the time-essence clause and the requirement to close by April 22, 2005, could be waived by the district. *See Alk*, 61 Or App at 161. On the other hand, if the obtaining of the lot line adjustment was a condition precedent to defendants' obligation to deliver marketable title at the time of closing, but not a promise, then the failure of the occurrence excuses defendants' obligation to perform and prevents the district from postponing the closing.

Whether the condition precedent in Section 6.2 of the earnest money agreement states a promise or a condition, or both, depends on the intent of the parties, as ascertained from a construction of the language used in the agreement, in light of all the surrounding circumstances. *Dan Bunn, Inc. v. Brown*, 285 Or 131, 143, 590 P2d 209 (1979). Thus, we begin with an analysis of the text of the earnest money agreement, considered in the context of the agreement as a whole and in light of the circumstances underlying its formation.

---

[1] The issue is discussed by Professor Murray, in John Edward Murray, Jr., *Murray on Contracts* 274-75 § 135 (2d ed 1974):

"It is often a difficult question of interpretation to determine whether a provision in a contract is to be construed as embodying a condition or a promise or both. The mere fact that language appropriate only to the one or the other type of stipulation has been used is not conclusive since a condition may be found to be implicit in language appropriate only to a promise and vice versa. In distinguishing between promises on the one hand and conditions on the other, the following analysis has proved helpful: (1) a promise is always made by one of the parties to the contract whereas an event can be made to operate as a condition only when the parties to the contract agree that it shall operate as such, except in those cases where conditions are created by law; (2) the purpose of a promise is to create a duty in the promisor, whereas the purpose of a condition is to postpone a duty in the promisor; (3) when a promise is performed, the duty is discharged; but where a condition occurs, the quiescent duty is activated; and (4) when a promise is not performed, a breach of contract occurs and the promisee is entitled to damages. On the other hand, when a condition fails to occur, the duty remains in its dormant state and is prevented from becoming perfected. When the condition can no longer occur, its non-occurrence discharges the duty. In addition, the nonoccurrence of the condition does not create a right to damages in the other party."

(Citations omitted.)

*Batzer Construction, Inc. v. Boyer*, 204 Or App 309, 129 P3d 773, *rev den*, 341 Or 366 (2006).

The text of the agreement describes the contingency as a condition or occurrence, rather than a promise. The district's obligation to purchase "is contingent on satisfaction of * * * [a] condition * * * [of county] approval of a lot line adjustment." It is the *county's* action, not defendants' action, that is the contingency of closing. Indeed, the property described in the agreement (Tax Lot 2806, "consisting of approximately 16.98 acres"), because it involved the conveyance of a lot and a portion of another lot, could not be conveyed without the occurrence of county approval of the lot reconfiguration. *See* ORS 92.012 (forbidding partitioning of land except in compliance with land division procedures); ORS 92.017 ("A lot or parcel lawfully created shall remain a discrete lot or parcel, unless the lot or parcel lines are vacated or the lot or parcel is further divided, as provided by law.").

The agreement does not explicitly impose on defendants the duty to obtain the lot line adjustment. In fact, Section 6.2 makes the parties jointly responsible for initiating and bearing the costs of the lot line adjustment. It would appear from the text of the agreement that the lot line adjustment was an occurrence that the parties sought jointly as a prerequisite to defendants' ability to convey the property and to the district's obligation to purchase the property. Thus, the parties had a mutual obligation of good faith and fair dealing with respect to their respective roles in accomplishing the goal of a lot line adjustment, which would encompass both parties' cooperation in the lot line adjustment. The district does not assert that, other than defendants' refusal to extend the closing date a second time, defendants did not act in good faith.[2]

The district contends, however, that the text of the agreement—in particular, the recital—implies an exclusive

___

[2] As an alternative ground for affirmance, the district asserts that defendants breached their implied duty of good faith and fair dealing in refusing to extend the closing date a second time. At the time of trial, that claim had not been pleaded, and it was not tried to the court. We cannot say that the record would not have been developed differently had it been tried to the court. *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). We therefore decline to consider it as an alternative ground for affirmance.

obligation on defendant to obtain the lot line adjustment. The recital requires defendants to convey "16.98 acres of land which prior to closing, shall be combined into one parcel to be known as Tax Lot 2806 pursuant to a lot line adjustment." That statement, the district asserts, demonstrates the parties' clear intent that accomplishment of the lot line adjustment was a part of defendants' obligation to convey Tax Lot 2806. We disagree. The fact that the contract contemplated that a lot line adjustment was necessary to the parties' purpose of transferring the subject property demonstrates, as we have said, that it was a condition precedent to closing. But the existence of that predicate does not suggest that the parties intended that the lot line adjustment was defendants' responsibility and that defendants are accountable for the lack of any adjustment. The bare text of the recital itself does not imply that joint intent.

The district further asserts that, because the lot line adjustment was dependent on defendants' cooperation, as they were the owners of the property, and because defendants were in possession of information necessary for the county to complete its action, defendants were "in control" of the lot line adjustment, and a promise to obtain the adjustment should be inferred. Citing a Ninth Circuit decision for the rule that "[c]ourts are especially loath to find a condition precedent when the alleged condition is peculiarly within the control of one of the contracting parties," *Lockwood v. Wolf Corp.*, 629 F2d 603, 611 (9th Cir 1980), the district contends that, necessarily, the lot line adjustment was not merely a condition, but a component of defendants' obligation to transfer 16.98 acres. The district further contends that it was defendants' own fault, in owning illegal parcels, that caused the delay. *See View Point Terrace, LLC v. McElroy*, 213 Or App 281, 287, 160 P3d 1023, *rev den*, 343 Or 691 (2007) (seller who caused extension of time for closing not permitted to raise untimeliness as defense to specific performance).

However, no party disputes that the parties initiated the lot line adjustment together, through their joint agent LaNier. Although the record on summary judgment shows that the delay occurred because of the illegal parcels, there is no evidence that defendants caused the defects in the parcels or were even aware of them at the time they entered into the

agreement. In truth, defendants did not "control" the outcome of the lot line adjustment application process. Despite the parties' joint efforts, the county denied the lot line adjustment application. Our own review of the record on summary judgment leads us to conclude that defendants cooperated fully with the county and that the lot line adjustment could not be completed by the closing date because of matters that were outside of either party's control.

The district asserts, nonetheless, that it was defendants' affirmative duty, exclusively, to work with the county until the lot line adjustment was accomplished, and to wait indefinitely for that to occur, even months or years after the agreement was executed. We decline to infer an obligation of that materiality when the parties have not included it in their agreement, especially when the agreement expressly provides that it "sets forth the entire understanding of the parties with respect to the purchase and sale of the Property."

As we have noted, the trial court concluded that the time-essence provision was for the benefit of both parties, and we agree. Because of that, the provision could be waived by a party only with regard to the timing of the other party's performance. *Alk*, 61 Or App at 161. In light of our conclusion that the lot line adjustment was a condition precedent that did not encompass a promise of accomplishment of the adjustment by defendants, we conclude that the timeliness of the lot line adjustment and the resulting closing date were not terms that the district could unilaterally waive.

Finally, we reject the district's contention that the time-essence provision itself had been waived by defendants when the parties mutually extended the closing date to April 22, 2005. The fact that the parties created a written addendum to the agreement with a specific closing date is evidence of the parties' intention that they considered the closing date to be significant and is consistent with the time-essence provision. *See Lee v. Thunder Development*, 77 Or App 7, 10-11, 711 P2d 978 (1985) (mutual extension of expiration date on option did not otherwise change conditions of option). *Compare View Point Terrace, LLC*, 213 Or App at 287-88 (parties mutually agreed by conduct to extend closing date), *with*

*Patterson v. Amundson*, 201 Or App 486, 496, 119 P3d 264 (2005) (vendor acted inconsistently with time-essence provision in never demanding timely closing). We reject without further discussion the district's contention that the undisputed facts in the record on summary judgment show that defendants are estopped from relying on the closing date and the time-essence clause. *See Bennett v. Farmers Ins. Co.*, 332 Or 138, 157-58, 26 P3d 785 (2001) (stating requirements for estoppel).

For the reasons expressed, we conclude that the trial court erred in denying defendants' motion for summary judgment and granting the district's cross-motion for summary judgment on the claim of specific performance. Necessarily, the supplemental judgment awarding attorney fees to the district is also reversed. In view of our holding, we do not address defendants' additional contention that the trial court erred in denying their motion for summary judgment on their counterclaim of rescission.

Limited judgment reversed and remanded for entry of judgment for defendants on district's claim of specific performance; supplemental judgment for attorney fees reversed.